(No. 30848.—

DAVID F. NITTERAUER *et al.*, Appellants, *vs.* CHARLES ODELL PULLEY *et al.*, Appellees.

*Opinion filed November 18, 1948.*

CHARLES D. WINTERS, and D. L. DUTY, (KENNETH B. POWLESS, of counsel,) all of Marion, for appellants.

R. W. HARRIS, and E. E. DENISON, both of Marion, for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

Appellants, David F. Nitterauer and Pauline Nitterauer, the owners of lot 12, block 3, Parrish Park Place Addition to the city of Marion, filed a complaint in the circuit court of Williamson County against appellees, who are the owners of lot 13 of said block. The complaint prayed that the appellees be compelled by mandatory injunction to remove that part of a double garage building which allegedly extends approximately three feet over the boundary line between said lots into the lot owned by appellants. The cause was referred to a master in chancery who, after a hearing, recommended that appellants have the relief asked for.

The chancellor sustained appellees' exceptions to the master's report and entered a decree denying the injunction. Appellants have appealed directly to this court contending that a freehold is involved.

The facts show that lot 13, owned by appellees, is a corner lot, irregular in shape due to the curvature in a street running lengthwise along the south side of the lot. On the north, lot 13 adjoins lot 12, the boundary line between them running from a street to an alley. Lot 12 as platted is rectangular in shape, 50 feet in width. Appellees, Charles O. Pulley and Elizabeth Pulley, own the east 90 feet of lot 13 as joint tenants, and have their residence thereon, the house facing on the same street on which lot 12 fronts. Appellees, George C. Champ and Ethel Champ, are joint owners of the west 54 feet of lot 13 adjoining the alley, and their house faces on the street which runs along the southern boundary of lot 13. On or near the line which divides lot 13 into the two parts described, a double-car garage had been erected some years ago with its rear wall located very near to the line between lots 12 and 13, as the same were platted. In 1943 Pulley and one Ohl, the latter being the predecessor in title of the Champs, extended the garage to the north by building on an extension for a distance of approximately three feet. This was done to accommodate new model automobiles which would not fit in the garage as originally constructed. It is this alleged encroachment on appellants' land which is the basis for this proceeding.

Appellants alleged that the appellees were bound to respect the boundary line between the lots as it was located by a survey made from the measurements and drawings appearing on the recorded plat of the addition. Appellees alleged that the boundary line between the lots was the center line of a depression or ditch running parallel with the platted boundary line about three feet to the north thereof on lot 12, if said lot was established according to the sur-

vey made from the plat; that such boundary was fixed by both parol and implied agreement between predecessors in title to both appellees and appellants. Appellees also alleged user and possession of the strip between the center of the ditch or depression and their lot as platted, from and after the alleged parol agreement up to the time of this suit. Appellants denied the existence of a parol or implied agreement; denied any actual or constructive notice to them of such contract, if such contract had been made; and denied the allegations as to possession and use. After contemplating the evidence on the issues thus formed, the trial court entered a decree by which it found that in 1923 or 1925, the then owner of lot 12 constructed the ditch, referred to above, to drain surface water from his land to the street; that the owners of the two lots then, by parol or implied agreement, fixed the dividing line of the two lots, as being along the center line of said ditch; that thereafter owners and successors in title occupied and possessed the land on the respective sides of said ditch; that all such parties acquiesced in said line during the years; and that appellees in good faith built the extension to their garage, relying on said understanding. The decree further found that appellees, "under the statute of limitations," were "entitled" to the strip of land extending from the south to the center line of said ditch and tile. This latter finding of the decree is the basis upon which appellants predicate their contention that a freehold is involved in this appeal. Appellees resist this contention and urge that the only issue presented is that of determining the proper line of division between the two lots. The rule, many times expressed by this court, is that to give this court jurisdiction of a direct appeal on the ground that a freehold is involved, the necessary result of the judgment or decree must be that one party gains and the other loses a freehold estate. (*Horner* v. *County of Winnebago,* 396 Ill. 382; *Carlson* v. *Chicago Title and Trust Co.* 375 Ill. 125.)

The decree here goes beyond a mere finding of the location of a boundary line, and in effect gives to appellees the title to a strip of land which the appellants claim is their property. Under said circumstances, we are of the opinion that a freehold is involved.

Both parties rely upon and have cited numerous decisions wherein this court has considered boundary line disputes in the nature of the present action. We have held that where a boundary line between two estates is indefinite or unascertained, the owners may, by parol agreement, establish a division line, and the line thus defined will afterwards control their deeds notwithstanding the Statute of Frauds. (*Horn* v. *Thompson,* 389 Ill. 176; *LaMont* v. *Dickinson,* 189 Ill. 628.) The principle upon which this conclusion is reached is that the effect of the parol agreement is not to pass real estate from one party to another, but simply to define the boundary line to which their respective deeds extend. Where the boundary line is unascertained, or in dispute, we have held that it may be established, first, by parol agreement and possession pursuant thereto; second, by an agreement implied from unequivocal acts and declarations of the parties and acquiescence for a considerable period of time; and, third, in the absence of any agreement, by undisturbed possession for more than twenty years. (*Cienki* v. *Rusnak,* 398 Ill. 77; *Purtle* v. *Bell,* 225 Ill. 523; *Clayton* v. *Feig,* 179 Ill. 534.) If the line is not in dispute and the intention of the parties is merely to determine the exact or true line, and in so doing an erroneous line is agreed upon by accident or mistake, the agreement will not be binding and the line will not be established merely because of the agreement previously entered into between the parties. *Purtle* v. *Bell,* 225 Ill. 523.

From the record before us it does not appear that there was ever a dispute between the owners of lots 12 and 13 until the appellants acquired title to lot 12. Neither does

it appear that any of the previous owners of the property had caused a survey or measurement of the lots to be made. The first survey made after the original platting of the lots was made for the appellants to be used as evidence in this proceeding. Further, it appears that all the previous owners of both lots did not know the true boundary line between the lots but assumed that the ditch was the dividing line. No fence or monument was ever placed above the ground to so fix the line.

Many of the previous owners of both lots were called as witnesses by appellees to establish their claim that the ditch had been fixed as the boundary line by parol or implied agreement. Hubert C. Coffee owned the east 90 feet of lot 13 from May, 1925, to May, 1934, when he sold it to Arthur B. Aikman, who in turn sold it to the appellees, Charles Odell Pulley and wife. Raymond Perry owned the remaining portion of lot 13 from 1925 until April, 1943, when he conveyed it to Richard Ohl. The latter conveyed it to appellees, Champ and wife, while this proceeding was pending. Ohl and Pulley built the extension to the garage in 1943, and the Champs were made substitute parties herein when Ohl conveyed his portion of lot 13 to them in May, 1946. In 1923 lot 12 was owned by August Weber who sold it to Fred Turner in August, 1937. Turner built a residence thereon in 1937 and sold the premises to Eugene Thompson the same year. In 1943, the year in which the garage was extended, appellants occupied the premises as tenants of Thompson, and later in October, 1944, purchased the premises from him. The dispute as to the boundary arose soon thereafter.

Coffee testified that when he owned part of lot 13, lot 12 was owned by Weber; that the ditch between the properties was in existence when he moved there and he considered it to be the boundary line between the two lots; that he mowed his grass up to the ditch, and that while he lived there no question as to the true boundary line ever

arose, nor was it discussed. Aikman testified that when he purchased from Coffee he accepted the ditch as the boundary line of his portion of lot 13. Appellee Pulley, who bought from Aikman, testified that when he built the extension on the garage he thought the ditch was the lot boundary, and believed he was "in the clear" when he built up to it. He further stated that at the time he talked with Thompson, who then owned lot 12, and the latter stated that although he did not know where the true boundary was, he considered the ditch to be the line. Pulley also testified that he mowed his lawn up to the ditch.

Perry, who owned the other portion of lot 13 from 1925 to 1943, did not appear as a witness. However, his grantee, Ohl, who built the extension on the garage along with Pulley, testified that he considered the ditch as the dividing line and mowed his grass to that point. He further testified that when the extension was built, appellant, then a tenant on lot 12, made no objection; and he thought even assisted in the painting of the garage. He stated that he had not caused a survey to be made and did not know where the property line was located. Appellee Champ, who purchased from Ohl while this suit was pending, stated that he did not know where the line was and that he was aware of the dispute when he bought his portion of lot 13.

The testimony of August Weber, who owned lot 12 from 1923 to 1927, when it was vacant, appears in the record by stipulation. Its context, taken from an affidavit, is as follows: "Mr. Coffee and I acquiesced and agreed that the center line of the drainage ditch was the dividing line between lots 12 and 13; and during all the time that we owned lots 12 and 13, we acquiesced in that understanding, and there was never any dispute between us as to where the dividing line was * * * and the said Hubert Coffee and Ella Coffee, his wife, had possession of the east 90 feet of lot 13 in block 3 on the south side of the center line of said drainage ditch and up to said center

line." Turner, to whom Weber conveyed lot 12, stated that when he acquired the lot it was vacant; that he considered the ditch between the lots as the south line of lot 12; that he had built a house on lot 12; that he did not survey the lot but tried to build it in the center thereof according to what he was told were the lot lines. The next owner of lot 12, Thompson, testified that he had purchased the premises without any survey; that he mowed grass to the drainage ditch; that he considered the boundary line on the south to be at the drainage ditch; that he did not know his neighbors there and had never had an occasion to discuss the boundary line with them; that both when he rented the property to appellants and later sold it to them, he did not explain or tell them the location of the south boundary line of the lot, and that there was never a fence or enclosure on or near the line.

For the appellants, several of the neighbors in the vicinity testified that there had never been a fence or other structure to mark the line of lot 12. Two engineers who surveyed the property, also testified for appellants and established that on the basis of the recorded plat, the extension of the garage projected from three to four feet on lot 12. One such engineer had originally laid out the lots, and both based their measurements on monuments found on the lots.

On the foregoing testimony, which is detailed at length, appellees base their claim that the boundary between the two lots was fixed by agreement. We cannot agree with that interpretation of the evidence. The only witness who stated that an agreement as to the boundary had been discussed and reached was Weber, who stated that he and Coffee had made an agreement that the ditch was the dividing line between the lots. He did not testify to a similar agreement with the owner of the balance of lot 13, nor did Coffee in his testimony verify that he had made such an agreement with Weber as to the former's portion of

lot 13. Subsequent owners of lot 12 did not testify to any further agreement or discussion relating to the boundary. Appellant David Nitterauer stated that he did not know where the line was, and that he did not know of any agreement fixing it. His grantor, Thompson, corroborates him in this respect by his statement that he did not tell Nitterauer anything about the line. It further appears that the ditch here involved was in existence when both Weber and Coffee purchased their respective properties. No evidence was introduced to show who excavated the ditch or the purpose in doing so. From the tenor of the testimony and an examination of photographs introduced into evidence, it appears that shallow ditch was but a natural passageway for drainage from the land adjacent to it, formed during the time that lot 12 lay unoccupied and vacant. No monument, fence or other structure was placed either on the boundary as shown by the plat, or along the center line of the ditch. In support of their contention that the center of the ditch was in fact agreed upon as the boundary line, appellees cite the holdings of this court in *Hubbard* v. *Stearns*, 86 Ill. 35; *Hellman* v. *Roe*, 275 Ill. 158; *Clayton* v. *Feig*, 179 Ill. 534, and *Dunnett* v. *Hughes*, 399 Ill. 120. An examination of those cases shows that fences or structures had been constructed and located over the true line for a great length of time. We do not find any case wherein a natural land depression has been made an agreed or implied dividing line by which subsequent purchasers were bound. A fence constructed or appearing between two properties would imply that the boundary between them was known or at least agreed upon, but the appearance of a natural drainage depression at or near the true line between two lots does not, in our opinion, constitute a visible or chargeable element which would give notice to a reasonable man that there had been a line fixed different from the one which the plat of the premises would establish. We are of the opinion therefore that the testimony

of appellees' witnesses does not establish an express or implied agreement to locate the boundary between the two lots at the center of the ditch, nor were there any acts or declarations which could be said to have established the line.

It is also contended by appellees, and the trial court so found, that they were entitled to the strip between the line as shown by the survey and the center of the depression by reason of adverse possession thereof by the successive owners of lot 13 for more than twenty years. The only evidence of physical acts upon the part of said appellees and their predecessors in title, tending to show a claim of ownership, is the mowing of the lawn to the ditch as heretofore referred to. None of the witnesses who had owned lot 13 or a part thereof, testified that he claimed or possessed the strip. They said only that they considered the ditch to be the line. This constituted but a thought in the mind of each such owner which he did not express or divulge to others. Under such circumstances, we must hold that the mowing of the grass on the strip was but an act coinciding with such thought, and not such an act of adverse possession as could ripen into a prescriptive right. Such use was at most only permissive and any acquiescence by the owners of lot 12 in such grass mowing could not assist in establishing a prescriptive right. The use for the period of the statute of limitations must have been adverse, under a claim of right, exclusive, uninterrupted, and with the knowledge and acquiescence of the owner of the land. None of these factors were present here. The trial court erred in holding that appellees were entitled to the disputed strip of land by reason of adverse use and possession thereof for over twenty years.

Although the issue was not formed by their pleadings, appellees sought to prove through the testimony of one Pfeiffer, a surveyor, that a survey of the half block in which lots 12 and 13 were located, disclosed there was a

deficiency in the ground area of lot 13 as compared to the recorded data. They contend that if said deficiency were divided among all the lot owners of the block, lot 13 would acquire the portion of lot 12 upon which the garage extension was built. A proceeding to divide a shortage in a block among the lot owners therein is one approved by our courts, (*Nilson Bros. Inc.* v. *Kahn*, 314 Ill. 275,) but to permit a relocation of a line dividing two lots by use of this method requires the changing of the boundaries of all other lots in the block to apportion the shortage to each, and it would necessarily unsettle all lot lines. (*Westgate* v. *Ohlmacher*, 251 Ill. 538.) A proper allocation of excess or deficiency cannot be made until the owners of all lots are in court. (11 C. J. S. 739.) Thus the absence of necessary parties, alone, would preclude the granting of relief to appellees on this basis, and such affirmative defense is not available to appellees.

It is argued that the appellants acquiesced in the building of the extension to the garage and cannot now complain. At the time the extension was constructed, in 1943, appellants were tenants and not the owners of lot 12. They did not know the platted line between the lots and without such knowledge they could not have acquiesced in any trespass on the property.

Appellees further contend that they should not be compelled to remove the extension from appellants' land, for the reason that they built the extension in good faith and in the honest belief that they were working on their own property. They say, in addition, that the encroachment is slight, if any, and that the expense involved in tearing down the building would be out of proportion to the benefits accruing to appellants by the demolition, and the cost out of proportion to the damage now being done to appellants' property. They argue that, under such circumstances, it would be inequitable to make them now demolish the building, and that a mandatory injunction so ordering

should not be granted in this case. Appellees might have had the belief, as they say, that their line ran to the ditch or depression, but this could not have been with the knowledge of any prior contract to that effect. They did not testify to any knowledge of the contract described by August Weber. In our opinion honest belief on their part cannot protect them, for they did not know exactly where the property line was and took no steps to ascertain it before proceeding with the work. Appellees and their predecessors in title to lot 13 had notice by the deeds to them that they were receiving parts of lot 13 and nothing else, and were bound by the boundaries thereof as shown on the recorded plat wherein said lot 13 was laid out and given that number. Where the encroachment is slight and unintentional, and the cost of removal great, and benefit to the adjoining owner small, it has been held that the court will ordinarily decline to compel a removal and will leave the complaining party to his remedy at law. (*Pradelt v. Lewis,* 297 Ill. 374.) We do not think that the encroachment here was unintentional in the sense that the word is used in the above-stated proposition of law. The owners of lot 13 added the three or four feet to their building without using any appreciable care to ascertain the boundary line. The fact that they had no idea where the line was located would place upon them the burden of taking some precaution to see that they did not encroach on lot 12. They made no attempt by inquiry, survey or other means, to find the line. They must be held to have constructed their garage addition at their peril of encroaching on lot 12, if it turned out that they did. We find that they did so encroach, without question.

Finally, appellees claim that a mandatory injunction should not be granted herein as being too drastic. Apropos to this contention, this court has held that a mandatory injunction will ordinarily issue against the maintenance by a landowner of an encroachment on the land of an

adjoining owner to compel the removal of such encroachment. (*Pradelt* v. *Lewis,* 297 Ill. 374.) We find nothing in the present case to cause us to deviate from this rule.

The decree of the circuit court of Williamson County denying relief to appellants herein, is not justified by the evidence and that court should have granted the relief prayed for by them. Its decree is therefore reversed and the cause remanded, with directions to enter a decree in accordance with the prayer of the complaint, compelling appellees to remove from lot 12, owned by appellants, that part of the garage building which encroaches on said lot 12 and which extends over the boundary line between said lots 12 and 13, as such line was fixed and determined in accordance with the recorded plat.

*Reversed and remanded, with directions.*